UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
CIERA WASHINGTON,                                    :
                                                     :
                    Plaintiff,    :
                                                     :
        -against-                           :
                                                     :     Case No.:  17-cv-2393 (JMF)
WALGREENS; WALGREENS CO.; DUANE                      :
READE; DUANE READE INC.; DUANE READE                 :
INTERNATIONAL, LLC; and Individually and             :
Jointly, LUIS GUERRERO; GERMAINE ALLEN;              :
VIVIAN GHOBRIAL; and CRYSTAL                         :
BECKRUM.                                             :
                                                     :
                    Defendants.  :
----------------------------------------------------------------x

## STATEMENT OF UNDISPUTED
## MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1
## OF DEFENDANTS WALGREEN CO., DUANE READE INC., DUANE READE
## INTERNATIONAL, LLC, GERMAINE ALLEN, AND VIVIAN GHOBRIAL

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Defendants Walgreen Co. ("Walgreens"), Duane Reade Inc. ("Duane Reade") (Walgreens and Duane Reade collectively, the "Duane Reade Defendants"), Duane Reade International, LLC, Germaine Allen ("Allen"), and Vivian Ghobrial ("Ghobrial") (all defendants are collectively referred to herein as "Defendants")[1] respectfully submit this statement of undisputed material facts[2] in support of their motion for summary judgment seeking to dismiss the claims of Plaintiff Ciera Washington ("Plaintiff" or "Washington").

---

[1] The undersigned does not represent individually named defendants Luis Guerrero and Crystal Beckum. Washington also incorrectly named "Walgreens" and "Duane Reade" as defendants. Although those are Defendants' trade names, they are not legal entities. Further, Duane Reade International, LLC is not a proper party at interest in this case.

[2] The undisputed facts set forth herein are followed by citations to their support in the record. Copies of all deposition testimony, deposition exhibits, and other documents cited herein are annexed to the Declaration of Aaron Warshaw, dated June 20, 2018 ("Warshaw Decl."), submitted herewith.

A.  **Washington's Employment With Duane Reade**

1.  On or about September 14, 2015, Washington began working for Duane Reade as a Shift Leader at Store No. 14489 located at 3387 Broadway, New York, New York. (Warshaw Decl. Ex. A - Deposition of Plaintiff – ("Pl. Dep.") at 38:5-7; 258:2-5; Warshaw Decl. Ex. B.)

2.  Upon hire, Washington earned $10 per hour. (Warshaw Decl. Exs. B, C.)

3.  At the time Washington was hired, Defendant Luis Guerrero ("Guerrero") was the Store Manager of Store No. 14489. (Pl. Dep. at 71:15-19.)

4.  On or about November 15, 2015, Washington was transferred to Store No. 14417 located at 568 West 125th Street, New York, New York. (Warshaw Decl. Ex. D - Deposition of Michael Geyer ("Geyer Dep.") at 20:22-21:6; Warshaw Decl. Ex. E - Deposition of David Jenny ("Jenny Dep.") at 153:23-24.)

5.  Her rate of pay and title did not change as a result of the transfer. (Pl. Dep. at 125:24-126:3.)

6.  Store No. 14417 is approximately two blocks away from Store No. 14489, and both locations are the same distance from Washington's home. (Pl. Dep. at 125:15-22.)

7.  Washington is unsure why she transferred stores. (Pl. Dep. at 71:7-11.)

8.  At the time Washington transferred, Defendant Crystal Beckum ("Beckum") was the Assistant Store Manager of Store No. 14417. (Pl. Dep. at 71:23-72:21.)

9.  In December 2015, Defendant Germaine Allen ("Allen") became the Store Manager at Store No. 14417. (Pl. Dep. at 388:20-21.)

10. Washington worked as a Shift Leader for Duane Reade until her termination on or about February 23, 2016. (Warshaw Decl. Exs. B, F.)

B.     **Washington Read and Agreed to Various Duane Reade Policies**

11.    Upon hire, Washington was required to read and agree to standard Duane Reade policies, including, but not limited to, conduct of business. (Warshaw Decl. Exs. B, G.)

12.    She was also provided access to Duane Reade's Employee Handbook, which contained, among other things, Duane Reade's policies on Equal Employment Opportunity, Policy against Harassment and Discrimination, the Complaint Procedure, Employee Theft, and the Code of Ethics. (Warshaw Decl. Ex. H.)

13.    Washington received training on these and other topics via online modules, including register procedures, line voids, price modifications and verifications. (Warshaw Decl. Ex. G; Warshaw Decl. Ex. I - Deposition of Vivian Ghobrial ("Ghobrial Dep.") at 392:394:6; Warshaw Decl. Ex. J.)

14.    Failure to follow policies contained in the Employee Handbook and other guidelines of the Company standards may subject team members to disciplinary action, up to and including termination of employment. (Warshaw Decl. Ex. H at DR 000036; Geyer Dep. at 79:12-15.)

15.    Duane Reade strictly enforces a policy of zero tolerance in regards to theft of merchandise regardless of a team member's title or length of service. (Geyer Dep. at 80:14-81:8; Warshaw Decl. Ex. H at DR 000081.)

16.    The definition of "theft" includes, but is not limited to, "ringing merchandise into the register for under the regular price." (Warshaw Decl. Ex. H at DR 000081.)

17.    Any employee who becomes aware of employee theft must immediately report it. Any employee who fails to do so or otherwise violates the policy, is subject to disciplinary action, up to and including termination of employment. (Warshaw Decl. Ex. H at DR 000081.)

18. The Employee Handbook also contains the "Reporting Misconduct or Unacceptable Behavior" policy, which states that "[a] successful workplace is one that both enables and encourages employees to perform at their best. When this type of environment is maintained, it usually results in superior productivity, product quality, and customer service." (Warshaw Decl. Ex. H at DR 000047.)

19. The Employee Handbook further states: "There are at times obstacles that must be overcome in order to keep this level of service. They are called business risks and are situations or events which harm you, your company, your coworkers or your customers. Unless managed properly, business risks can negatively impact a company's success. Business risks include [t]heft and dishonesty." (Warshaw Decl. Ex. H at DR 000048.)

20. While Washington agrees that employees should not steal from the Company, she refused to opine on whether theft and dishonesty can impact a business. (Pl. Dep. at 97:18-99:23.)

21. The Employee Handbook also states that, "[i]rresponsible and unacceptable behavior that will result in disciplinary action, up to and including termination" of employment includes "[g]ross insubordination, misconduct or negligence, [d]ishonesty, stealing and vandalism." (Pl. Dep. at 98:25-100:22; Warshaw Decl. Ex. H at DR 000049.)

22. Although Washington understands that gross insubordination, misconduct or negligence could certainly lead to termination, she could not recall and did not know whether dishonesty, stealing and vandalism could also lead to termination under the same policy. (Pl. Dep. at 98:25-100:22.)

C.     **Washington's Shift Leader Responsibilities**

23.    As a Shift Leader at Duane Reade, Washington was responsible for, among other things, managing and tracking store financial performance, cash control and inventory. (Warshaw Decl. Ex. K.)

24.    Washington claims that she was responsible for creating weekly schedules and responsible for payroll, but there is no evidence in the record to support that this assertion is true. (Pl. Dep. at 78:7-16; Warshaw Decl. Ex. L - Deposition of Germaine Allen ("Allen Dep.") at 122:18-123:3.)

25.    Shift Leaders are also responsible for opening and closing the store in the absence of store management. (Warshaw Decl. Ex. K.)

26.    Store No. 14417 would generally open at 7:00 a.m. (Pl. Dep. at 136:8-14.)

27.    In November and December 2015, the schedule at Duane Reade's Store No. 14417 typically included a single Manager or Shift Leader scheduled to arrive at 6:30 a.m., and then typically a second employee (typically a cashier) scheduled to begin working when the store opened at 7:00 a.m. (Warshaw Decl. Ex. M.)

28.    Although Washington makes much ado over the fact that she was scheduled to open Store 14417 alone, the schedule shows that she was treated no differently than her coworkers. (*Id.*)

29.    Specifically, between November and December 2015, numerous employees *other than Washington* were also scheduled to open Store No. 14417 alone on one or more occasions, including Beckum, Store Manager Michael Brito, Shift Leader Tyrone Rice, General Clerk Joshua Bryant, Shift Leader Jeffrey Nunez, and Shift Leader Brent Moss ("Moss"). (*Id.*)

30. When Washington's co-Shift Leader opened Store No. 14417, he would typically arrive at 6:45am or 6:50 a.m. to turn on the lights, count the safe, and count the registers to have the store ready to open at 7:00 a.m. (Warshaw Decl. Ex. N - Deposition of Brent Moss ("Moss Dep.") at 86:4-11.)

31. During that time, he typically closed the front door, and would then let in the cashiers by the time the store opened at 7:00 a.m. (Moss Dep. at 91:4-9, 21-25.)

32. Washington was scheduled to open Store No. 14417 on November 25, 2015, December 1, 2015, December 2, 2015, and December 16, 2015. (Warshaw Decl. Ex. M at DR 000308, DR 000310, & DR 000315.)

33. On those days, she was scheduled to arrive at 6:30 a.m. (*Id.*)

34. On other days in November and December 2015, the other employees described above would open the store and were scheduled at 6:30 a.m. (Warshaw Decl. Ex. M.)

**D.    The Alleged November 2015 Robbery**

35. Washington alleges that, in November 2015, she was opening the store alone when a "homeless man" robbed the store. (Amended Compl. ¶¶ 113-131; Pl. Dep. at 140:2-141:3.)

36. Washington claims that, while she was in the office counting the safe, the man entered the store, Washington confronted him, the man threatened to attack her, and he then left the store. (Pl. Dep. at 161:24-162:22.)

37. Washington claims that the man left the store with stolen items, and she did not see whether he had a weapon. (Pl. Dep. at 164:8-19.)

6

**E.     The Alleged December 2015 Robbery**

38.     On or about December 16, 2015, Washington's store was allegedly robbed while she was working.  (Warshaw Decl. Ex. O.)

39.     Washington was scheduled to begin her shift at 6:30 a.m. that day.  (Warshaw Decl. Ex. M at DR 000315.)

40.     There are thirty two (32) cameras in Store No. 14417. (Jenny Dep. at 25:18-21.)

41.     Five of these thirty two (32) surveillance cameras captured the robbery on December 16, 2015.  (Warshaw Decl. Ex. O; Jenny Dep. at 28:8-12.)

42.     The surveillance camera footage shows Washington entering the store at approximately 6:21 a.m. and going to the alarm panel.  (Warshaw Decl. Ex. O; Jenny Dep. at 18:15-20; 61:9-13.)

43.     Very soon after, a man came in through the doors behind her and approached her at the alarm panel.  (Warshaw Decl. Ex. O; Jenny Dep. at 18:21-20:10.)

44.     He then guided her back to the office in the rear of the store.  (Warshaw Decl. Ex. O.)

45.     Upon entering the office, Washington can be seen stumbling.  (Warshaw Decl. Ex. O.)

46.     While in the office, Washington opened the safe while the man stood behind her and removed some cash.  (Warshaw Decl. Ex. O; Jenny Dep. at 20:13-16.)

47.     They left the office and went to the front register.  (Jenny Dep. at 20:16-18.)

48.     There, he appears to say something to her, and she took out her identification card from her purse and gave it to him. (Jenny Dep. at 20:18-21:15.)

49. Washington called the police (911) after the incident, and she was taken to the Mount Sinai Hospital's Emergency Room (the "Emergency Room") shortly after. (Pl. Dep. at 173:21-174:16; 220:22-221:7; Warshaw Decl. Ex. P.)

50. The incident does not appear to be physically violent. (Warshaw Decl. Ex. O; Jenny Dep. at 18:17-21:15.)

51. The video contains no indication that the man carried or used a gun or weapon. (Warshaw Decl. Ex. O; Jenny Dep. at 33:12-18.)

52. Washington offers alternative facts about what happened that morning. Washington began shifting her story for what happened that morning starting almost immediately. (Jenny Dep. at 33:12-34:16.)

53. In her statement to the police on December 16, 2015, Washington informed them that a male approached her from behind holding a hand gun and asked her to open the safe. (Warshaw Decl. Ex. Q.)

54. She also informed the police that she was struck in the face with a hand gun. (*Id*.)

55. Washington's version of events at the Emergency Room is also contradictory. (Warshaw Decl. Ex. P at DR 000908.)

56. At approximately 7:51 a.m., a healthcare provider entered a note that Washington reported that she was hit with a gun across the left side of her face and thrown over a chair. (*Id*. at DR 000910.)

57. At 8:08 a.m., another healthcare provider noted that Washington claimed she was pistol whipped to the face and in the process fell over a chair injuring her left ankle. (*Id*. at DR 000914.)

58.     At approximately 8:21 a.m., another healthcare provider noted that Washington claimed she had sustained multiple blows to the face and head with a gun.  (*Id*. at DR 000912.)

59.     Washington also claimed that she was pushed multiple times towards the safe and tripped over a chair, twisting her ankle.  (*Id*.)

60.     Another healthcare provider similarly recounted Washington's statements in her report, stating that Washington informed her that the perpetrator hit her with the butt of a gun multiple times to the face and pushed her down into a chair.  (*Id*. at DR 000913.)

61.     Washington also reported to the healthcare providers at the Emergency Room that she was not pregnant.  (*Id.* at DR 000925.)

62.     Washington did not recall making many of these statements to her healthcare providers, and did not know why they would note such statements because she allegedly did not inform them as such.  (Pl. Dep. at 218:7-230:24.)

63.     Washington denied reporting to her healthcare providers that she was thrown over a chair.  (*Id*. at 223:10-224:4.)

64.     Washington denied saying she suffered multiple blows to her face.  (*Id*. at 226:14-24.)

65.     Washington denied reporting to her healthcare providers that she was pushed multiple times toward the safe.  (*Id*. at 226:25-227:11.)

66.     Washington denied reporting that she was hit by the butt of a gun multiple times and pushed into a chair.  (*Id*. at 227:17-228:5.)

67.     Washington denied ever stating she was pistol whipped.  (*Id*. at 228:23-229:24.)

68.     Washington claims she was told by the doctors at the Emergency Room that she had facial contusions and fractures. (Pl. Dep. at 225:14-15; 237:6-238:19.)

69. Notably, these injuries are not noted in any of the Emergency Room reports. (Warshaw Decl. Ex. P.)

70. Following the alleged robbery, Walgreens' Asset Protection Manager David Jenny ("Jenny") was contacted to conduct an investigation into the incident. (Jenny Dep. at 159:14-160:10.)

71. During his investigation at least four police offers at the scene informed Jenny that they did not believe a gun was involved in the robbery, and that Washington's statements to them had changed in between the incident and by the time she got to the hospital. (Jenny Dep. at 33:12-34:16; 38:5-8.)

72. The police officers also informed Jenny that Washington's account of the incident did not match with what they saw on the surveillance cameras and what she relayed back at the hospital. (Jenny Dep. at 166:8-174:14.)

73. Specifically, Washington stated that she was pistol whipped by a handgun in the face and that her jaw was broken. (Jenny Dep. at 166:25-167:9; 174:9-14.)

74. However, they did not see any injuries consistent with what she reported. (*Id.*)

**F.** **Washington's Time Off From Work Following the December 2015 Robbery**

75. After the alleged December 16, 2015 robbery, Washington did not return to work, and Walgreens' leave department was notified about the alleged robbery and her absence. (Warshaw Decl. Ex. R.)

76. As a result, Washington received two weeks of short-term disability benefits, comprising $252.21, and a Workers' Compensation claim was submitted to the carrier Sedgwick. (Warshaw Decl. Exs. R, S.)

77.     On January 12, 2016, Walgreens' leave department called Washington seeking additional documentation. (Warshaw Decl. Ex. R at DR 000200].)

78.     However, Washington claimed that she had already submitted medical documentation from the Emergency Room, and Washington became hostile and yelled at the leave department representative.  (*Id*.)

79.     The leave department representative explained that Washington would need to submit medical records to support her continued time off work. (*Id.*)

80.     However, Washington did not provide such documentation yet she remained off work. (*Id*.)

81.     On February 22, 2016, Washington returned to work at Store No. 14489 and she presented a doctor's note for the first time.  (Warshaw Decl. Ex. T.)

82.     Thereafter, the leave department representative continued to try to contact Washington seeking additional documentation to support her time off work and potential claim for Workers' Compensation benefits. (Warshaw Decl. Ex. R.)

83.     Washington never submitted any additional documentation. (*Id*.)

### G. Continuing Investigation of Plaintiff's Participation in Two Fraudulent Transactions

84.     Prior to the alleged robbery and Washington's leave of absence, on October 8 and 13, 2015, Washington was involved in multiple fraudulent transactions that were rung up by her co-worker Greg Spears ("Spears"). (Geyer Dep. 109:15-110:23; Warshaw Decl. Exs. U-X.)

85.     During the October 8th transaction, Spears rung up Washington for the following items: Crest 3D toothpaste, valued at $4.49; an Oral B toothbrush, valued at $9.49; a Travel Kit, valued at $1.29; Colgate mouthwash, valued at $6.99; Listerine mouthwash, valued at $5.49; and

Always panty liners, valued at $10.99.  (Warshaw Decl. Ex. V at DR 000153; Warshaw Decl. Exs. U, W.)

86. Washington should have paid a total of $38.74 for this transaction; yet Spears rang up each of the items for between $0.37 and $0.42, such that the total price of the transaction came out to $2.47. (Warshaw Decl. Ex. V at DR 000153.)

87. During the October 13th transaction, Washington purchased three items: Colgate toothpaste, valued at $4.99; Gillette Venus razors, valued at $9.00; and Crest 3D White Strips, valued at $55.99.  (Warshaw Decl. Ex. V at DR 000153; Warshaw Decl. Exs. W, X.)

88. Notably, Spears voided Washington's purchase of Crest 3D White Strips, which are valued at $55.99, but Washington nonetheless can be seen exiting the store with the item in her bag.  (Warshaw Decl. Ex. V at DR 000153; Warshaw Decl. Exs. W, X.)

89. Washington should have paid a total of $69.98 for this transaction; yet Spears rang up the two remaining items for $0.42 each, such that the total price of the items came out to $0.84.  (Warshaw Decl. Ex. V at DR 000153.)

90. Spears' fraudulent transactions, which also included giving similar unauthorized discounts to at least one other employee, was noticed by Guerrero, who then notified Walgreens' Asset Protection department.  (Warshaw Decl. Ex. Y – Deposition of Troy Hennessy ("Hennessy Dep." at 18:22-19:3.)

91. Asset Protection Manager Troy Hennessy ("Hennessy") was then assigned to conduct an investigation. (Hennessy Dep. at 19:5-25; Geyer Dep. at 104:11-105:4.)

92. Hennessy conducted an investigation that initially included interviewing Guerrero and Spears. (Hennessy Dep. at 15:25-16:19; 21:25-22:17; 34:20-25; Warshaw Decl. Ex. Z.)

93. Hennessy concluded that Spears had been making unauthorized price modifications and giving employees unauthorized discounts. (Warshaw Decl. Ex. Z.)

94. Spears admitted to his involvement, and, on November 12, 2015, his employment was terminated. (Warshaw Decl. Exs. AA, Z.)

95. At that point, Hennessy determined that Shayna Davis ("Davis") was also involved in the modifications. (Warshaw Decl. Ex. Z.)

96. However, Davis resigned before Hennessy could interview her. (Hennessy Dep. at 153:18-22; Warshaw Decl. Ex. Z.)

97. Hennessy's investigation nonetheless continued following Spears' termination and Davis' resignation. (Geyer Dep. at 104:11-105:4.)

98. Hennessy discovered Washington's involvement by reviewing the October 8 and 13, 2015 transactions described above. (Hennessy Dep. at 172:5-19.)

99. By reviewing the transaction reports and video recordings of the transactions, Hennessy concluded that Washington had purchased items that had been rung up by Spears at a suspiciously discounted price. (Warshaw Decl. Ex. Z.)

100. However, by the time that Hennessy discovered that Washington was also involved in the fraudulent transactions, Washington was off work following the alleged December 16, 2015 robbery. (Hennessy Dep. at 171:8-17, 172:5-19; Ghobrial Dep. at 272:11-25.)

101. Due to Washington's absence from work, Hennessy was unable to interview her until she returned from leave on February 22, 2016. (Ghobrial Dep. 272:11-25.)

**H.      Washington's Employment Was Terminated For Violating Company Policy**

102.    When Washington returned to work on February 22, 2016, Hennessy interviewed Washington regarding her involvement in the price modifications. (Hennessy Dep. at 86:11-16.)

103.    Initially, she claimed that she was distracted because she was on her phone. (Pl. Dep. at 308:13-310:12.)

104.    However, the video footage of the transactions does not show that Washington was on her cell phone. (Warshaw Decl. Exs. W, X; Pl. Dep. at 320:2-10.)

105.    In response to Hennessy's investigation, Washington provided a written statement in which she claimed that, in October 2015, she realized that her purchased items had been rung up at a discounted price. (Warshaw Decl. Ex. BB.)

106.    According to Washington's statement, Guerrero met with her regarding the modification, and told Washington that all she had to do was pay for the full price of the items because she was new to the company. (Warshaw Decl. Exs. BB, CC.)

107.    Guerrero also provided a statement to Hennessy that, on October 16, 2015, it came to his attention that Spears was modifying prices of items purchased by employees, including Washington. (Hennessy Dep. at 189:21-190:16; Warshaw Decl. Ex. CC.)

108.    Guerrero stated that, although he told Washington that she would not be disciplined because she did not know company policies, he still reported the modifications to Asset Protection. (Warshaw Decl. Ex. CC.)

109.    Based on his interview with Washington, Hennessy concluded that Washington was aware of the price modifications at the time she purchased her items and knowingly accepted the unauthorized discounts. (Hennessy Dep. at 183:2-8.)

110. Hennessy relayed his findings and the supporting evidence to Ghobrial. (Ghobrial Dep. at 114:7-115:10.)

111. As a result, on February 23, 2016, Ghobrial decided to terminate Washington's employment for her misconduct and violation of rules. (Ghobrial Dep. at 58:11-60:2; 233:2-238:21; Geyer Dep. at 57:8-12.)

### I.     Washington's Unfounded Complaints

112. Washington alleges that, in or around September 2015, Guerrero (allegedly of Spanish decent) made comments toward her that she views as racist and sexist (e.g., "You Morenas don't know anything about this" and "You don't eat this type of food"), and that she complained about such comments. (Am. Compl. ¶¶ 42-51.)

113. Washington also claims that, after she transferred to Store No. 14417, she overheard Guerrero tell Beckrum on the phone, "Is the Morena Mujer taking over?" (Pl. Dep. at 128:10-17.)

114. Washington understood that the comment was referring to her, that it means "black girl," and she believes it is racist. (Pl. Dep. at 128:18-129:4.)

115. Other than this alleged comment, Washington had no contact with Guerrero after she transferred to Store No. 14417 on November 15, 2015. (Pl. Dep. at 129:5-8.)

116. Washington claims she called Ghobrial to complain about Guerrero. (Pl. Dep. at 120:11:23.)

117. However, Ghobrial denies that Washington ever complained to her about Guerrero. (Ghobrial Dep. at 405:16-406:22.)

118. Washington claims that her co-workers called her a "Black Bitch!" and "Morena." (Compl. ¶¶ 135-55.)

119. Washington asserts that her co-workers made alleged comments that she was "too black to have tattoos" and she was "black like my sweater." (*Id.*; Pl. Dep. at 128:10-129:4, 132:3-133:2.)

120. Washington claims that, in or around November 2015, she was left out of a "supervisor meeting" held by Guerrero and Beckrum, who allegedly referred to Washington as "Morena" during the meeting. (Am. Compl. ¶¶ 70-90.)

121. Washington never complained of discrimination, harassment or retaliation at any point during her employment. (Geyer Dep. at 196:15-197:25; Ghobrial Dep. at 405:16-406:22.)

122. At the time of Washington's termination, she did not have any accrued but unused vacation or sick time available to her. (Warshaw Decl. Ex. DD.)

Dated: New York, New York
       June 20, 2018

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.

By /s Aaron Warshaw
   Aaron Warshaw
   Shabri Sharma
599 Lexington Avenue, 17th Floor
New York, New York 10022
(212) 492-2500
aaron.warshaw@ogletree.com
shabri.sharma@ogletree.com

*Attorneys for Defendants Walgreens, Walgreens Co., Duane Reade, Duane Reade Inc., Duane Reade International, LLC, Germaine Allen, and Vivian Ghobrial*

34489832.3