# EXHIBIT 16

**In the Matter Of:**

WASHINGTON -against- WALGREENS

17-cv-2393(JMF)

---

# CIERA WASHINGTON

*May 14, 2018*

---

*Non-Confidential*



800.211.DEPO (3376)
EsquireSolutions.com

```
1                    C. Washington
2              MR. WARSHAW:   Mark this
3         Washington Exhibit 8.
4                        (Employee Handbook was
5                        marked as Washington
6                        Exhibit 8 for
7                        identification.)
8         Q.   Ms. Washington, you have been
9    handed a document marked as Washington
10   Exhibit 8.  It bears Bates stamp DR 35
11   through DR 84.
12              It is a lengthy document, but I
13   will just ask you to look at the first
14   page, if you would, the first few pages.
15              (Witness complies.)
16        Q.   Have you ever seen this document
17   before, either in paper or electronic
18   format?
19        A.   I don't recall at this time.
20        Q.   I will just note for the record
21   at the bottom of the page it states "Duane
22   Reade Employee Handbook updated 9/1/2013."
23              Do you see that?
24        A.   Yes.
25        Q.   If you flip to the first page,
```



```
 1                    C. Washington
 2    actually the cover page, do you see someone
 3    has handwritten 2013 to 2015 at the top of
 4    document?
 5              Do you see that?
 6         A.    Yes.
 7         Q.    Do you recall at any point during
 8    your employment at Duane Reade receiving a
 9    copy of the company handbook either in
10    electronic or written format?
11         A.    I don't recall at this time.
12         Q.    Do you recall receiving any type
13    of training regarding Duane Reade's
14    employee handbook?
15         A.    I don't recall at this time.
16         Q.    Can you turn to page 2, the
17    second page of the document, and do you see
18    in the second paragraph it states, "As a
19    new employee you will be on 30, 60, 90 days
20    probation depending on the position you
21    hold.  During this period you will be
22    evaluated to see if your work performance
23    meets the guidelines of the company
24    standards.  Should you not meet these
25    guidelines your employment may be
```



```
 1                    C. Washington

 2               MS. MORRISON:    Objection.

 3       A.    I am African-American, black.

 4       Q.    What is your national origin?

 5       A.    What exactly do you mean by that?

 6       Q.    How do you identify your national

 7   origin, if at all?

 8       A.    African-American, black.

 9               MS. MORRISON:    You have to speak

10   up.

11       A.    African-American, black.

12       Q.    What is Mr. Guerrero's race?

13               MS. MORRISON:    Objection.

14       A.    Hispanic.

15       Q.    Do you know what his national

16   origin is?

17       A.    No.

18       Q.    What is Germaine Allen's race?

19               MS. MORRISON:    Objection.

20       A.    I don't recall at this time.

21       Q.    Do you know what Mr. Allen's

22   national origin is?

23       A.    At this time, I don't recall.

24       Q.    What is Ms. Beckrum's race?

25               MS. MORRISON:    Objection.
```



1                    C. Washington

2       A.    She is Hispanic.

3       Q.    Do you know what her national

4    origin is?

5       A.    At this time, I don't recall.

6       Q.    When did you first start having

7    issues with Mr. Guerrero?

8       A.    Approximately a few weeks till

9    when I started.

10      Q.    Can you describe those issues to

11   me?

12      A.    He began to say racial slurs and

13   different things to me about the type of

14   food he was eating, that because of my

15   color, black people don't know about

16   Spanish food, and home cooked Spanish food

17   is not same thing a store bought Spanish

18   food.

19           He would do little things that

20   would make me feel uncomfortable about my

21   skin color, say things about me being

22   black.

23      Q.    Do you recall anything specific

24   that he said other than what you talked

25   about with food?



```
 1                   C. Washington
 2       A.    There was a lot different
 3   specific things he said.  Specifically, as
 4   far as me being black and I have no idea
 5   about Spanish people, not just their food,
 6   their origin and what they eat.  And black
 7   people don't know -- have the same
 8   basically racial situation as Spanish
 9   people.
10       Q.    Do you recall anything else that
11   he said?
12       A.    At this time, I don't recall
13   anything else.
14       Q.    When he made these comments, were
15   you on the floor, were you in the back
16   room?
17       A.    We were in the room together.
18       Q.    In what room?
19       A.    The office.
20       Q.    Did he ever make any comments to
21   you in a location other than the office?
22       A.    No, but it was around others in
23   the office.
24       Q.    Who were those others?
25       A.    Dimitri was there one time.  And
```



```
1                    C. Washington

2      please?

3          Q.    Sure.

4                Other than what's in your

5      complaint and what you just described, are

6      you aware of any other comments that

7      Mr. Guerrero made that you would view as a

8      slur or inappropriate?

9          A.    No.

10         Q.    When Mr. Guerrero made these

11     comments, did you say anything to him in

12     response?

13         A.    Yes.

14         Q.    What did you say?

15         A.    That just because I am black

16     doesn't mean I don't know about Spanish

17     food.  And I also replied that I do eat

18     Spanish food.

19               I complained to him about that's

20     basically discriminating against me, you

21     shouldn't say things like that, racial

22     slurs about me because I am black, I don't

23     know about Spanish food.  I complained to

24     him and it just went in one ear and out the

25     other.
```



```
 1                    C. Washington

 2       Q.    Why did you view that as a slur?

 3       A.    Because he made it clear to me

 4   that because I was black, I had no clue

 5   about Spanish food.

 6       Q.    Do you recall anything else that

 7   you said to him or that he said to you in

 8   response to your complaints?

 9       A.    Besides him laughing and taking

10   it as a joke, I don't recall at this time.

11       Q.    At the time that you were working

12   underneath Mr. Guerrero, did you complain

13   to anybody else about his comments?

14       A.    Vivian.

15       Q.    Do you recall when you complained

16   to Vivian?

17       A.    At this time, I don't recall

18   exactly when, but it was after it was said.

19   Directly after the comment was said, once

20   Mr. Guerrero took it as a joke.

21       Q.    Did you complain to her in

22   person, over the phone, in an e-mail?

23       A.    Over the phone.

24       Q.    Just so I am clear, it is Vivian

25   Ghobrial; is that right?
```



1                    C. Washington

2      A.     Human resources.  I don't know

3   her last name.

4      Q.     Prior to your speaking to

5   Ms. Ghobrial over the phone, had you had

6   any communications with her?

7      A.     For human resources things, yes.

8      Q.     So you are aware that she was

9   your HR rep; is that fair to say?

10     A.     Yes.

11     Q.     What did Vivian say to you and

12   what did you say to her when you spoke to

13   her on the phone?

14             MS. MORRISON:   Objection.

15     A.     I explained to her how I felt and

16   why I was upset.  And, of course, pretty

17   much Vivian brushed it off and ignored my

18   comments because nothing was done.

19     Q.     Why do you say "of course"?

20     A.     I don't understand the question.

21   What do you mean?

22     Q.     When you said of course Vivian

23   brushed it off?

24     A.     Because -- I mean nothing was

25   done when I verbally complained about it,



```
 1                    C. Washington
 2   so there was no action for Luis, there was
 3   nothing done.  It was like my complaint
 4   just went out the window.
 5        Q.   Do you know whether Vivian spoke
 6   to Mr. Guerrero in response to your call?
 7        A.   I don't recall at this time.  I
 8   don't know.
 9        Q.   I am asking do you know now?
10        A.   I don't know.
11        Q.   Did Vivian say anything to you in
12   response during the call?
13        A.   She pretty much brushed it off.
14        Q.   What specifically did she say, do
15   you recall?
16        A.   "Maybe you shouldn't take it like
17   that."  You know, she just made it seem
18   like I shouldn't be upset about what I was
19   upset about.
20        Q.   Did she say anything else?
21        A.   I don't recall at this time.
22        Q.   Did you have any other
23   conversations with Ms. Ghobrial about
24   Mr. Guerrero other than this call?
25        A.   I don't recall at this time.
```



1                    C. Washington

2        Q.    Did you have conversations with

3    anyone other than Ms. Ghobrial about

4    Mr. Guerrero?

5        A.    Besides him?

6        Q.    Besides him.

7        A.    I complained to another

8    co-worker, and that was it.

9        Q.    Who was the co-worker?

10        A.    Joel.

11        Q.    What did you say to Joel?

12        A.    What Luis said to me.

13        Q.    What, if anything, did Joel say

14    to you?

15        A.    It was more so a shock reaction.

16        Q.    Is Joel a man or woman?

17        A.    He is a man.

18        Q.    Did Joel say why he was shocked?

19        A.    He told me that was very nasty

20    and rude for him to say any of that to me.

21    And that's pretty much it.  I mean, I

22    couldn't expect him to do anything.

23        Q.    Just so I am clear, other than

24    Mr. Guerrero, Ms. Ghobrial and Joel, did

25    you complain to anyone else about



```
 1                     C. Washington
 2    Mr. Guerrero's comments?
 3        A.    Not that I recall at this time.
 4        Q.    Do you think Mr. Guerrero's
 5    comments were based on your race?
 6        A.    Yes.
 7        Q.    Why do you think that?
 8        A.    His exact words, the whole aura,
 9    the way it was said to me it was meant to
10    hurt my feelings.  It was meant to
11    discriminate against me.  It was meant to
12    bash me for my race.
13        Q.    How do you know what he meant by
14    what he said?
15        A.    He made it clear to me, black
16    people don't know about Spanish food.
17        Q.    Do you think it is an accurate
18    statement that he made?
19        A.    Of course not.
20        Q.    Is there any other way other than
21    the comments that you feel that
22    Mr. Guerrero mistreated you in any type of
23    way?
24        A.    Besides after the fact of me
25    complaining about him getting transferred.
```



```
 1                      C. Washington
 2      Q.    Why don't you describe that to
 3   me?
 4            MS. MORRISON:   Objection.
 5      Q.    Meaning that you complained and
 6   were transferred?
 7      A.    After everything happened with
 8   the Spanish food, next thing you know I was
 9   transferred to another store after
10   complaining to human resources about what I
11   was told.
12      Q.    Did anyone discuss the transfer
13   with you?
14      A.    No.
15      Q.    At the time you were working for
16   Duane Reade, which store was closer to your
17   home, the location at 137 and Broadway or
18   the one at 528 Broadway?
19      A.    Neither one.  They were like two
20   blocks away from each other.
21      Q.    So about the same, right?
22      A.    Yes.
23      Q.    When you were transferred, did
24   you have the same job title?
25      A.    Yes.
```



1                   C. Washington

2        Q.    Did you have the same pay?

3        A.    Yes.

4        Q.    Did you view the transfer as a

5   demotion in any way?

6        A.    I don't know.

7        Q.    Do you view it that way now?

8        A.    I mean, I had different feelings

9   about it.  That's why my answer is I don't

10  know.

11       Q.    What are those different

12  feelings?

13       A.    I mean, one way is I know I was

14  transferred because of defending myself and

15  actually saying something about me being

16  discriminated against.

17            And the other is like it pretty

18  much is a demotion, I got sent to another

19  store to like to be treated way low, like

20  as a person, not only to be treated way low

21  but to be physically abused from being at

22  that store so I would look at it as a

23  demotion.

24       Q.    Who physically abused you?

25       A.    I got robbed twice in that



```
1                    C. Washington

2    location.

3         Q.    Other than the robberies, just so

4    I am clear, you were not describing any

5    physical abuse other than the robberies; is

6    that correct?

7         A.    Right.  It is more so emotional

8    with -- when I got transferred everything

9    changed from where I was at at my original

10   location.

11        Q.    After you transferred, did you

12   have any other contact with Mr. Guerrero?

13        A.    Besides him speaking about me on

14   speakerphone, no.

15        Q.    What do you mean by that?

16        A.    It is in the complaint.  He

17   called the new store, the phone was on

18   speaker, he was talking to Crystal, and

19   they were talking about me, the Black

20   Morena that was taking over.  Making jokes

21   about me.

22              And I literally walked in and

23   heard the whole conversation.

24        Q.    How soon after you started

25   working at the new store did that occur?
```



1                    C. Washington

2        A.    Maybe, I want to say, a few weeks

3   in there.

4        Q.    Did you say anything to Crystal

5   or Mr. Guerrero at that time?

6        A.    I couldn't.  Crystal made it

7   clear to him that I walked in, so there was

8   nothing really left to discuss.  I already

9   heard it.

10       Q.    How do you know that he was

11  describing you?

12       A.    She told him on the phone that I

13  walked in, and the exact words were, "Is

14  the Morena Mujer taking over?"

15             I am the only black supervisor

16  there that they were talking about as a

17  female.

18       Q.    What did you understand what that

19  expression means?

20       A.    That means black girl.

21       Q.    Do you believe that it is a

22  racist expression?

23       A.    Very.

24       Q.    Why is that?

25       A.    I would never describe you as a



```
 1                C. Washington

 2   white boy. That is very racial.  And I am

 3   not a black girl.  My name is Ciera.  My

 4   mom didn't name me Morena.

 5        Q.    Other than that call, did you

 6   have any other contact with Mr. Guerrero

 7   after you transferred?

 8        A.    No.

 9        Q.    Do you know if Mr. Guerrero had

10   any role in your separation from the

11   company?

12        A.    He had a huge role.

13        Q.    How is that?

14        A.    Because after the robbery when I

15   came -- when they forced me to come back to

16   work, they transferred me back to Luis'

17   store.  After being robbed at 528, they

18   sent me back to his store.

19             As soon as I got there, human

20   resources was there, they made me come back

21   to work to terminate me.  As soon as I

22   walked in, coming back to work, even though

23   the doctor did not clear me, as soon as I

24   walked in the door, they terminated me.

25        Q.    Who told you that your employment
```



```
 1                 C. Washington
 2  white boy. That is very racial.  And I am
 3  not a black girl.  My name is Ciera.  My
 4  mom didn't name me Morena.
 5      Q.   Other than that call, did you
 6  have any other contact with Mr. Guerrero
 7  after you transferred?
 8      A.    No.
 9      Q.   Do you know if Mr. Guerrero had
10  any role in your separation from the
11  company?
12      A.    He had a huge role.
13      Q.    How is that?
14      A.    Because after the robbery when I
15  came -- when they forced me to come back to
16  work, they transferred me back to Luis'
17  store.  After being robbed at 528, they
18  sent me back to his store.
19           As soon as I got there, human
20  resources was there, they made me come back
21  to work to terminate me.  As soon as I
22  walked in, coming back to work, even though
23  the doctor did not clear me, as soon as I
24  walked in the door, they terminated me.
25      Q.   Who told you that your employment
```



```
 1                    C. Washington
 2    was terminated?
 3         A.    I walked in.  It was Luis and
 4    this guy from human resources with a suit
 5    on.  And he asked about a transaction that
 6    I had nothing to do with, that was even
 7    paid back.  I even showed him the receipt.
 8    And he terminated me.
 9              He said they had no clue about
10    the receipt.  And I showed him everything.
11    Luis had all the knowledge of the receipt
12    and I was terminated.
13         Q.    Do you know whose decision it was
14    to terminate your employment?
15         A.    I don't know.
16         Q.    Have you come to learn any
17    information about your termination as a
18    result of this lawsuit?
19         A.    I don't know.
20         Q.    At any point, have you reviewed
21    any transcripts of other people who have
22    been deposed in this case?
23         A.    No.
24         Q.    Do you know the name of the
25    person from HR?
```



```
 1                    C. Washington
 2    was terminated?
 3         A.    I walked in.  It was Luis and
 4    this guy from human resources with a suit
 5    on.  And he asked about a transaction that
 6    I had nothing to do with, that was even
 7    paid back.  I even showed him the receipt.
 8    And he terminated me.
 9              He said they had no clue about
10    the receipt.  And I showed him everything.
11    Luis had all the knowledge of the receipt
12    and I was terminated.
13         Q.    Do you know whose decision it was
14    to terminate your employment?
15         A.    I don't know.
16         Q.    Have you come to learn any
17    information about your termination as a
18    result of this lawsuit?
19         A.    I don't know.
20         Q.    At any point, have you reviewed
21    any transcripts of other people who have
22    been deposed in this case?
23         A.    No.
24         Q.    Do you know the name of the
25    person from HR?
```



```
1                    C. Washington
2    in the computer and they were printed?
3         A.    On a spreadsheet.
4         Q.    Have you ever seen work schedules
5    for Duane Reade in a format similar to what
6    is in front of you?
7         A.    Yes.
8         Q.    At what time have you seen those?
9              MS. MORRISON:    Objection.
10        A.    When I was at work the schedule
11   was posted.
12        Q.    Would the postings of the
13   schedule physically look like this?
14        A.    Yes, every schedule looked like
15   this the ones I did and she did.  It was
16   done the same way.
17        Q.    You had an opportunity to look
18   through these documents.
19              Please take your time.
20              My question for you is if you
21   have any reason to believe that these are
22   inaccurate as to the schedules for your
23   store?
24              I will point out that while you
25   are reviewing each document is the weekly
```



1              C. Washington

2    schedule and continues for two or three

3    pages, and all of the employees are listed

4    in alphabetical order, so your name appears

5    on the document somewhere on page 2 of each

6    of these documents.

7              MS. MORRISON:   I'm sorry, is

8         there a question pending?

9              MR. WARSHAW:   I asked her to

10        review the documents and tell me if

11        she thinks these are inaccurate as to

12        the weekly schedules of her store.

13             MS. MORRISON:   Objection.

14        A.   From what I am seeing, these are

15   not schedules I've seen at all.

16        Q.   Why is that?

17        A.   Because from what I am looking at

18   is not accurate, how she used to do the

19   schedules whatsoever.

20        Q.   What is inaccurate about these

21   documents?

22        A.   The times of the opening.  The

23   times of the other people.  It was never

24   like this.

25        Q.   And you would agree with me that



1                   C. Washington

2       it indicates that other individuals started

3       working at 6:30 a.m., at least that's what

4       these documents indicate; is that correct?

5           A.    No, they started working at 7:00

6       a.m.

7           Q.    Can you turn back to the first

8       page, if you will.

9                   We have Sunday, 11/8/2015.

10                  If you go to the bottom, do you

11      see Jeffrey Nunez?

12                  Do you see that?

13          A.    He worked 6:30.

14          Q.    If you go back to Monday and

15      Tuesday, Miguel Brito, B.R.I.T.O., this

16      document at least indicates a start time of

17      6:30 a.m. for both of those days.

18                  Do you see that?

19          A.    Again, I was not there when

20      Miguel was there.  So I don't know how my

21      name was added here because I wasn't

22      present when he was there.

23          Q.    Let me ask you this:   What was

24      the date, to the best of your recollection,

25      of the first robbery incident?



```
 1                   C. Washington

 2       A.    Yes.

 3             MS. MORRISON:   Now I see it.

 4       Withdraw the objection.

 5       Q.    And underneath that, it states,

 6  "ED triage/intake by Laura Blaney,"

 7  B.L.A.N.E.Y., "RN, 12/16/15 at 7:51 a.m."

 8             Do you see that?

 9       A.    Yes.

10       Q.    Do you see underneath that, it

11  states, "PT," which I think is patient "was

12  robbed while at work.  Reports she was hit

13  with a gun across left side of face and

14  thrown over a chair.  Left ankle pain and

15  swelling noted along with facial pain and

16  swelling."

17             Do you see that?

18       A.    Yes.

19       Q.    Do you recall reporting that to

20  one of the nurses, that information there?

21       A.    No, I don't recall.  I didn't say

22  I was thrown over the chair.  I fell over

23  the chair.

24       Q.    So where it says here, "Thrown

25  over a chair," you don't recall making
```



1                    C. Washington

2       Q.    And under "Assessment/Plan," it

3   states, "25-year-old female with a PMH of

4   RLE cellulitis years ago now has chronic

5   RLE edema brought in after an assault that

6   occurred PTA.  PT or patient works at the

7   Duane Reade at 125th Street.  She was

8   opening store by herself when she was

9   physically assaulted.  Plaintiff sustained

10  multiple blows to the face and head with a

11  gun.  No LOC occurred.  Plaintiff was

12  pushed multiple times towards the safe and

13  tripped over a chair twisting left ankle."

14            Did you report to Ms. Pessalano

15  that you had suffered multiple blows to

16  your face?

17      A.    No.  I told Ms. Pessalano that I

18  was robbed at gunpoint, I was hit on my

19  face, I hit my face on the safe when I fell

20  over chair and I was hit with the gun.

21      Q.    Do you know why she indicated

22  that you suffered multiple blows?

23      A.    No, I don't know why she did what

24  she did.  I don't know.

25      Q.    Do you know why she reported you



```
 1                  C. Washington
 2    were "Pushed multiple times toward the
 3    safe"?
 4        A.    When you say pushed, I was
 5    directed when he came in the store to the
 6    safe.
 7        Q.    My question is a little
 8    different.
 9              Do you know why Ms. Pessalano --
10        A.    No, I can't tell you why she did
11    what she did.
12        Q.    Can you turn to page 6 of this
13    document.  This is an entry by Jennifer
14    Huang, H.U.A.N.G., on 12/16/15 at 8:22 a.m.
15              Do you see that at the top?
16        A.    Yes.
17        Q.    Do you see a few lines down, it
18    states, "Hit her with the butt of a gun
19    multiple times to the face and pushed her
20    down into a chair"?
21              Do you see that?
22        A.    Yes.
23        Q.    Did you report that information
24    to Ms. Huang?
25        A.    Never said nothing about a butt
```



```
 1                   C. Washington
 2   or was pushed down, no.
 3        Q.    Do you know why she indicated
 4   that on this report?
 5        A.    No.
 6        Q.    Do you see a few lines down, it
 7   states, "Periorbital,"
 8   P.E.R.I.O.R.B.I.T.A.L., "and nasal
 9   tenderness, no swelling or bruising"?
10             Do you see that?
11        A.    Yes.
12        Q.    At the bottom do you see it
13   states, "CT facial bones"?
14        A.    Yes.
15        Q.    Do you know what a CT scan is?
16        A.    A CAT scan.
17        Q.    If you could turn the page again
18   to page 7, DR 914.
19             Do you see there is another entry
20   by someone named Catherine M. Diaz,
21   D.I.A.Z., at 12/16/2015 at 8:08 p.m.?
22        A.    Yes.
23        Q.    Do you see under the narrative,
24   it states, "Plaintiff arrived via EMS, S/P
25   assault while working in Duane Reade.
```



```
 1                    C. Washington
 2    Patient states she was pistol whipped to
 3    the face and in the process fell over a
 4    chair injuring her left ankle.  Plus
 5    swelling noted to right periorbital.  And
 6    patient states left side of face is what is
 7    hurting her the most.  Incident was already
 8    reported to police who are currently here
 9    with patient.   Patient is very nervous as
10    she states assailant took her state ID with
11    him"?
12             Do you see that?
13        A.    Yes.
14        Q.    Is that information that you
15    reported to Ms. Diaz?
16        A.    Yes, I never told Ms. Diaz the
17    words pistol whipped.
18        Q.    Other than that statement, is it
19    accurate?
20        A.    Yes.
21        Q.    Do you know why she used the
22    words pistol whipped?
23        A.    No, I can't tell you why she did
24    what she did.
25        Q.    Do you see at the bottom of the
```



1                    C. Washington

2          question and answer?

3               (Record read.)

4    BY MR. WARSHAW:

5          Q.    Ms. Washington, turning back to

6    18 or DR 925, do you see on several of

7    these lines there is questions:  "Is the

8    patient pregnant?"  And the answer is "No"?

9               Do you see that?

10         A.    Yes.

11         Q.    Is that information accurate?

12         A.    No, I don't remember telling

13   nobody none of that, so it is not accurate.

14         Q.    Were you on pregnant on December

15   16, 2015?

16         A.    Yes, but I wasn't aware of it

17   until later on.

18         Q.    When did you become aware?

19         A.    About -- I am not too sure about

20   the exact date, but it was afterwards,

21   maybe about a week or two afterwards.

22         Q.    Do you know if they conducted a

23   pregnancy test on you when you were at

24   Mount Sinai on December 16, 2015?

25         A.    No, they didn't.

